# EXHIBIT C



October 31, 2025

Via email

Hon. Alan Lawson
101 E. College Ave., 5th Floor
Tallahassee, FL  32301

      Re: Rebel A. Cole

Dear Justice Lawson,

      This letter is Dr. Cole's response to Florida Atlantic University ("FAU" or "the University") suspending him for his speech on his personal social media account engaging with other users on matters of public concern. In her September 15, 2025 letter, Dr. Anita Pennathur provided the following grounds for Dr. Cole's suspension:

> The University has received complaints which gives us reason to believe that your continued presence on the job adversely affects university operations, and this action is being taken during the pendency of an investigation.  The investigation will include a review of your conduct including, but not limited to, your recent social media posts that the University reasonably believes might disrupt the efficient function of the University, and/or jeopardize the safety or welfare of other employees, colleagues, or students.

      Dr. Pennathur did not identify the number of complaints, who made them, or the nature of the complaints.  She also provided no facts upon which the University concluded that Dr. Cole's "presence on the job adversely affects university operations."  She further provided no facts or details on Dr. Cole's alleged "conduct" that was so concerning other than unidentified "recent social media posts." Of course, Dr. Pennathur offered no facts to suggest such "conduct" or speech "might disrupt the efficient function of the University, and/or jeopardize the safety or welfare of other employees, colleagues, or students." Significantly, such a suggestion is knowingly false and made knowing it would severely damage Dr. Cole's reputation.  All the University provided prior to our meeting was to confirm that it suspended Dr. Cole because of his speech on his personal social media (X) account.

      Indeed, it was not until our meeting with you last Friday, October 24, that anyone associated with the University shared which posts FAU is relying on for its unconstitutional action against Dr. Cole.  As we understand it, you have provided all social media posts that FAU is relying on to support its decision.  Further, there is no other "conduct" the University is relying on to support its decision.  Additionally, as discussed

---

**Edward H. Trent | PARTNER**
Office   (202) 787-1060
Mobile  (202) 656-2917
Email   etrent@schaerr-jaffe.com

**SCHAERR | JAFFE** LLP
1717 K Street NW, Suite 900
Washington, DC 20006
www.schaerr-jaffe.com



during our meeting, you provided us with copies of all "complaints" FAU received regarding Dr. Cole, at least for purposes of your investigation. Accordingly, we will proceed as if the information provided, constituting Exhibits 9 through 18, is the totality of "evidence" against Dr. Cole. If that is incorrect, please provide the additional information and/or allegations so they may be addressed.

**Applicable University Policy**

In her letter, Dr. Pennathur represents that Dr. Cole's suspension is pursuant to Article 17.12(c) of the UFF Collective Bargaining Agreement ("CBA"), University Regulation 5.012, and University Policy 8.2. In citing these provisions, Dr. Pennathur provides no factual basis to believe Dr. Cole violated any of those regulations or policies. As set out below, the few personal social media posts from Dr. Cole provided during our October 24 meeting fail to support any suggestion that those posts "might disrupt the efficient function of the University, and/or jeopardize the safety or welfare of other employees, colleagues, or students." Furthermore, during our meeting, no facts were provided to support that assertion – no student, faculty, or administer was identified who claims to have been affected by Dr. Cole's off-duty First Amendment protected speech on matters of public concern.

*Article 17.12(c) of the CBA* provides:

> Leave Pending Investigation. When the Provost or designee ***has reason to believe that the employee's presence on the job will adversely affect the operation of the University***, the Provost or designee may immediately place the employee on leave pending investigation of the event(s) leading to that belief. The leave pending investigation shall commence immediately upon the Provost or designee providing the employee with a written notice of the reasons therefore. The leave shall be with pay, with no reduction of accrued leave. (emphasis added)

Initially, no information has been provided to support why the Provost believes "that [Dr. Cole's] presence on the job will adversely affect the operation of the University." Dr. Pennathur's letter does not set out any facts to support such a conclusion and other than copies of certain social media posts, most of which were provided outside of the context in which they were made, no information has been provided on how Dr. Cole's First Amendment protected private speech concerned, let alone adversely affected the University at all. Even the few "complaints" the University received do not suggest any disruption to FAU operations. Accordingly, Dr. Cole's suspension was in violation of the CBA.



*University Regulation 5.012*

In her September 15 letter, Dr. Pennathur does not reference any specific portions of Regulation 5.012. Nevertheless, we set out those portions identified in our October 24 meeting:

Section 3(b)b addresses "Disciplinary Procedures" for "Employees who intentionally act to impair, interfere with, or obstruct the mission, purposes, order, academic atmosphere, operations, processes, and functions of Florida Atlantic University." Subsection (b)b. addresses "Just Cause" for "Job-related offenses" including an "offense" that "occurs while the employee is off duty and away from the job." Under such circumstances, not only must the conduct be "***job-related***" but "any disciplinary action taken must be ***preceded*** by a decision, ***supported by facts***, that the offense adversely affects the employee's ability to perform assigned duties, or the University's ability to carry out its mission and purposes." (emphasis added)

Not only were Dr. Cole's personal social media comments not "job-related," but to date, no facts have been provided to support any suggestion that Dr. Cole's protected speech "adversely affects [his] ability to perform assigned duties, or the University's ability to carry out its mission and purposes." Dr. Cole's comments, as addressed below, were unrelated to the University (including any administrator, faculty, staff, or student), addressed issues of public concern, were made off-duty on his personal social media account that does not associate him with the University, and had no effect on his assigned duties.

Section 4 sets out "Standards for Disciplinary Action" and includes a "list of unacceptable conduct, further defined as incompetence or misconduct." The sub-sections referenced in our meeting were:

- Section 4(o) "Threatening or abusive language."

- Section 4(w) "Prohibited Harassment – As defined by law, University Regulation or Policy."

- Section 4(x) "Conduct unbecoming a public employee – Conduct, whether on or off the job, which adversely affects the employee's ability to continue to perform his assigned duties, or the University's ability to carry out its assigned mission."

- Section 4(oo) "Violation of State or Federal law or University Regulations or Policies".

Dr. Pennathur's letter certainly provides no insight regarding any potential violation beyond boilerplate language quoting Section 4(x) with no reference to sections 4(o), 4(w), or 4(oo). Further, other than copies of personal social media posts, no facts or explanation has been provided on how Dr. Cole is alleged to have violated any of these provisions.



Finally, you referenced Section 8 that states, "This Regulation shall apply to acts conducted on or off campus when relevant to the orderly conduct, processes and functions of the University." Again, no facts have been offered to suggest that Dr. Cole's personal social media posts had any effect on the "orderly conduct, processes and functions of the University," meaning FAU could not have reasonably believed Dr. Cole violated Regulation 5.012. If there are any facts to support such an allegation, we welcome the opportunity to respond.

*University Policy 8.2 Standards of Conduct*

While Dr. Pennathur's September 15 letter references Policy 8.2, she makes no reference to any provision Dr. Cole is alleged to have violated or how his speech contravened this policy. In our meeting, however, you referred to sections 2 and 3 of this policy.

Section 2. Respect for others.

The FAU Community is diverse in a plurality of other ways. The actions of each community member establish and maintain the culture of tolerance and respect. The FAU Community should respect the rights and dignity of others regardless of their differences and must conscientiously abide by the principles of nondiscrimination adopted by the University. Harassment and discrimination have not place in our community. Exploitation of persons for any purposes will not be tolerated.

While Dr. Pennathur's letter says nothing of "discrimination" or "harassment," FAU provided you with three posts where Dr. Cole interacts with other social media users, two including transgender issues (Exhibits 11, 12) and one involving the killing of a young woman on public transportation in Charlotte, North Carolina that references the race of individuals in the video of the killing (Exhibit 13). As addressed below, none of these posts constitute "harassment" of any FAU employee or student nor "discrimination" against any such individual. Further, the posts were not provided in context of the dialogue taking place between Dr. Cole and the other social media user(s). Rather, the University has taken the position of intolerance of Dr. Cole's personal views expressed outside of his job, a direct violation of his First Amendment rights.

Section 3. Civility and professionalism.

The FAU Community shall maintain standards of civility and professionalism in the workplace. Members of the FAU Community are expected to conduct themselves in a positive, professional, collegial manner and to work harmoniously with other members of the FAU Community as well as external constituents. Discussion, dissent, and expression of opinion are to be expected and welcomed in an academic environment, but they must be conveyed in a



respectful manner. All members of the FAU community including, but not limited to, administrators, faculty, and staff have a responsibility to contribute to the orderly and effective functioning of their units and the University as a whole, conduct themselves in a collegial manner in all interactions and avoid exploitation of FAU Community members for private advantage. Speech or actions, whether verbal, written or gestural, should not be disrespectful. Examples of unprofessional or disrespectful activity include without limitation, the use of crude, abusive, or threatening language; workplace interference or sabotage; making negative or disparaging comments about the professional capabilities of others; making vicious, profane, or malicious statements, or statements known to be false or otherwise demonstrating a reckless disregard for the truth, concerning the University or any member of the FAU Community; engaging in violence or conduct that an objective person would deem threatening of the FAU Community; or repeated workplace behavior that a reasonable person would find hostile and threatening.

Again, Dr. Pennathur's September 15 letter makes no reference to any alleged conduct that would violate this provision. Importantly, Dr. Cole is not accused of engaging in any inappropriate, unprofessional or disrespectful interaction with any administrator, faculty, staff or student. If FAU maintains that Dr. Cole somehow violated this provision, we welcome the University's factual explanation and the opportunity to respond accordingly.[1]

**Social Media Posts, Complaints, Media Coverage**

During our October 24 meeting, you provided the following Exhibits which constitute the totality of social media posts made by Dr. Cole apparently at issue, any complaints identified by FAU as referenced in Dr. Pennathur's September 15 letter, and two media articles written after Dr. Cole's suspension. None individually or collectively support a violation of any FAU rule, regulation or policy, nor do they violate any federal or state law. Rather, each statement is protected under the First and Fourteenth

---

[1] During our October 24 meeting, you referenced the University's values found on pages 13-14 of the Academic Affairs Faculty Handbook (Exhibit 6), and the Disruptive Behavior policy on pages 55-56 of the Handbook. Yet, the University's values are not a code of conduct. Further, the Disruptive Behavior policy concerns *student* behavior in the classroom and does not concern professors such as Dr. Cole. Similarly, Article 5.3 of the CBA does not create additional responsibilities related to the "expression of opinion." Nor is Article 6, "Nondiscrimination" applicable as there are no allegations or facts that would support a claim that Dr. Cole discriminated against anyone, let alone anyone associated with FAU. Finally, Article 21.3(b), "Safe Conditions" is not applicable as Dr. Cole did nothing to threaten the safety of anyone at FAU or otherwise. He made no "threats of violence," and did not engage in "harassment, bullying, intimidation [or] disruptive behavior."



Amendments to the United States Constitution and Article 1 Section 4 of the Florida Constitution.

- Exhibit 9 – X communication related to individuals who cheered on murder of Charlie Kirk by chanting "We got Charlie in the neck, in the neck. We got Charlie in the neck, in the neck." During this, others were clapping and cheering. When one commentator attempted to defend the chant as free speech, Dr. Cole responded, "This is NOT free speech. It is inciting a riot. Illegal. Someone should shut his mouth." Then, in response to a mocking reply that says, "No one is afraid of you," Dr. Cole replied, almost quoting Attorney General Pam Bondi verbatim, "Be very afraid. We are going to hunt you down. We are going to identify you. Then we are going to make you radioactive to polite society. And we will make you both unemployed and unemployable."

- Exhibit 10 – This exhibit contains the last sequence from Exhibit 9.

- Exhibit 11 – This is a single post from September 14, 2025. It is not provided with the remainder of the thread, so it is not in context. It appears to reference the man who murdered Charlie Kirk while calling out race bating from the person to whom Dr. Cole is responding. As noted during our meeting, Dr. Cole deleted the post on his own due to the use of the term "trannie" which, as he noted, is viewed as pejorative by some.

- Exhibit 12 – This is a post from September 14 that is also provided out of context since the post to which Dr. Cole is responding is not provided. It was part of the same thread referenced in Exhibit 9 when another user on X made foul, ad hominem attacks at Dr. Cole for his comments in Exhibit 10. This user directed the following at Dr. Cole, "stfu you limp dick mfker." Exhibit 12 was Dr. Cole's response. The interaction was not with anyone known to be associated with FAU.

- Exhibit 13 – This is a September 14, 2025 email from "Abigail Zilly" using a generic iCloud email address. Based on the email, the person is seeking to punish Dr. Cole for his speech because the University had made it known that other faculty were disciplined for their personal social media posts denigrating Charlie Kirk following his public assassination. As Dr. Cole has made clear, such action violates the First Amendment rights of those faculty members just as his suspension violates his



rights. Attached to the email is an undated post without context about "guns do save lives." The post is responding to attacks on Charlie Kirk's position regarding Second Amendment rights. The email also includes Exhibits 10 and 11. Finally, the email provides an undated post about people witnessed a woman get murdered on a public transit train in Charlotte, North Carolina but failed to render any aid. Again, without the full thread, it is not possible to put the post in context including how the question of race was raised in the first place. As Dr. Cole explained, his purpose was to "shame" those who simply got up and walked away leaving the woman to die on the floor of the train.

- Exhibit 14 – This is a September 15, 2025 email from 10:51 PM (post suspension) from a person claiming to be the parent of a 15- and 17-year-old child potentially considering FAU for college in the future. The individual references a Reddit post that is referencing Exhibit 11 and falsely claims that Dr. Cole "is literally threatening students." Neither the email author nor the person making the Reddit post provide any evidence of this and the University has provided none either. Proposing to expose someone who celebrates the murder of another or justifies political violence is not "threatening students."

- Exhibit 15 – This is a "Free Dr Cole" post on X.

- Exhibit 16 – This is a post on X by "The Darkpulse Files" doxxing Dr. Cole as a professor at FAU with reference to Exhibit 9. In the post, apparently to FAU, the account holder asks if Dr. Cole is an employee of the University, demonstrating that Dr. Cole's personal X account does not associate him with the University.

- Exhibit 17 – This is a series of anonymous X posts apparently made to the FAU account with a few calling for action against Dr. Cole. Two ("madame_Ovaries" and "leslymxntes") claim he was "threatening students on social media for exercising free speech" (presumably in response to Exhibit 9) but they offer no evidence of this at all. X user "madame_Overies" also suggests Dr. Cole engaged in "sexism and racism" without any basis to support that assertion whatsoever. Other posts, such as the one from "jessbmomof3" is not referencing Dr. Cole at all but calling out those who celebrated the murder of Charlie Kirk on a college campus (exactly what Dr. Cole did). There is no information in several posts that would allow us to determine



who those social media users are talking about (e.g., "margaretaccursia", "joidean", "lawvines"). It is remarkable that a professor would be suspended and publicly ostracized by the University based on these few comments by anonymous individuals.

- Exhibit 18 – This is a copy of a South Florida Sun Sentinel article, "How Florida educators' comments about Charlie Kirk are testing free speech rights," written after Dr. Cole was suspended. The article demonstrates the illegality of FAU's actions here. Indeed, the same legal principles are at issue in *Negy v. Butler*, et. al. pending in the Middle District of Florida where the court denied the administrators' motion for summary judgment last May.

- Tayor Green also mentioned a September 17, 2025 University Press article entitled "FAU confirms third faculty member on leave tied to Charlie Kirk posts" that addresses Dr. Cole's suspension. In our meeting, you referenced a portion of the article that states:

    > In one recent post on X, Cole wrote a message directed at a transgender Delta Air Lines pilot: "A man pretending to be a woman should never pilot one of your planes."

That post was not included in any of the embedded links within the article and there is no basis to put it in context. Further, given that the post was not provided by FAU, included in any "complaints" about Dr. Cole, or otherwise referenced as a basis for Dr. Cole's suspension, this article's reporting of such a post should be of no consequence. This is even more important given that there is no way from the article to put any such post in proper context.

Each of Dr. Cole's posts were on matters of public concern: the assassination of Charlie Kirk, a 31-year-old, conservative advocate for free speech and father of two; consequences of soft-on-crime policies that contributed to the brutal murder of a young immigrant on public transportation while others did nothing to help, gender politics and gender ideology, and allegations of racism when discussing current events. Such protected speech cannot legally form the basis of disciplinary action, yet that is precisely what FAU has done here.

**Legal Principles**

A public university professor's rights of free speech are evaluated under the *Pickering/Connick* standard established by the Supreme Court. Under this standard,



there is a three-step framework for analyzing public employee speech claims. The first step is determining whether the employee spoke as a private citizen rather than pursuant to official duties under *Garcetti v. Ceballos*, 547 U.S. 410 (2006). Social media posts made on personal accounts outside work hours using personal devices strongly suggest the employee's speech was as a private citizen. Indeed, in *Gaines v. Jefferson County School District*, 705 F.Supp.3d 664 (S.D. Miss. 2023), a district court in Mississippi found that even though the teacher's comments were about employee pay, because the comments were on Facebook and made available to the public, the comments were made as a private citizen. *Id.* at 672.

The second step examines whether the speech addressed a matter of public concern, or what can "fairly [be] considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). As noted above, Dr. Cole's comments did not address an internal or personal grievance but were quintessential First Amendment speech on matter of public concern. Indeed, he was engaging with other members of the public on topics that were extensively covered in the press – namely the tragic assassination of Charlie Kirk on a college campus in Utah, the public reaction to political violence in this country, debates on addressing crime and gun rights, and issues of sexuality and gender. All these topics have received extensive coverage in the legacy media, in the courts, including the United States Supreme Court, and on social media where ordinary citizens gather to discuss, debate, and pontificate on the issues of the day. Of course, "[t]he arguably 'inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Snyder v. Phelps*, 562 U.S. 443, 453, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011).

Having satisfied the first two steps in the analysis, we now turn to the balancing test established in *Pickering v. Board of Ed. of Tp. High School Dist. 205, Will County, Illinois*, 391 U.S. 563 (1968). Here, the employee's interest in commenting on public matters is weighed against the employer's interest in promoting efficient public services. *Id.* at 568. For a professor suspended for personal social media comments unrelated to work, this analysis favors Dr. Cole here. For example, a Texas federal court found that a professor's social media post about his university's pandemic policies was protected speech, outweighing the university's interest in limiting the teacher's criticism of the university's pandemic policies. *Jones v. Matkin*, 623 F.Supp.3d 774, 785 (E.D. Tex 2022).

Similarly, a District Court in Colorado held the professors' social media statements about gender discrimination in the department outweighed any university concerns of the impact the statements may have had on working relationships within the department. *Cowden v. Board of Governors of Colorado State University System by and through Colorado State University-Pueblo*, 622 F.Supp.3d 1019, 1034-35 (D. Col. 2022). In so holding, the court reaffirmed that "Apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 1035 (quoting *Flanagan v. Munger,* 890 F.2d



1557, 1567 (10th Cir. 1989)). FAU cannot even offer an "apprehension of disturbance" let alone a good faith basis based on fact.

FAU has offered no evidence of even potential, let alone actual disruption to remotely suggest the *Pickering* balancing test tilts in its favor. "The indispensable predicate to balancing ... is evidence from the public employer of actual or incipient disruption to the provision of public services.... Without such evidence, 'there simply is no countervailing state interest to weigh against the employee's First Amendment rights.'" *Jones*, 623 F. Supp. 3d at 785 (quoting *Grogan v. Lange*, 617 F. App'x 288, 291 (5th Cir. 2015) (quoting *Vojvodich v. Lopez*, 48 F.3d 879, 884 (5th Cir. 1995))). FAU cannot simply assert a potential of disruption to overcome Dr. Cole's rights as a citizen to speak on matters of public concern. Yet here, the University has not even attempted to offer actual evidence to support its decision to suspend Dr. Cole for his private speech. The law is clearly established that such actions violate his First Amendment rights and must be rectified immediately. Contrary to clearly established law, Dr. Cole has been suspended, stripped of his classes and other duties and barred from campus for over six weeks, causing irreparable harm.

While we view the *Pickering* analysis as dispositive, there is one other legal issue we feel compelled to address. During the October 24 meeting, you raised the possibility that some of Dr. Cole's statements regarding transgender status could potentially be viewed as discriminatory. In doing so, you suggested that transgender status was a protected classification under both Title VII and Title IX. That is incorrect.

As an initial matter, it is true the Supreme Court in *Bostock* found that termination of an employee due to the employee's "transgender status" constituted discrimination "because of sex." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 668-69, 140 S. Ct. 1731, 1753–54, 207 L. Ed. 2d 218 (2020). At the same time, however, the court noted "We agree that homosexuality and transgender status are distinct concepts from sex." *Id.* at 669. In doing so, the Court limited the reach of its decision to a termination decision based on "transgender status" and specifically did not reach questions such as restroom and locker-room access, dress codes, or religious liberty issues. *Id.* at 681-83. Indeed, the Supreme Court has expressly chosen to not expand *Bostock* beyond the employment context. See *U.S. v. Skrmetti*, 605 U.S. ___, 145 S. Ct. 1816, 1834-35 (2025). Of course, Dr. Cole took no employment action against anyone, which was the issue in *Bostock*.

The limited reach of *Bostock*, which has no application to Dr. Cole's social media posts at issue here, was further elaborated on by a District Court in Texas striking down certain elements set out in internal guidance from the EEOC on the reach of Title VII when it comes to "gender identity" as a protected class. In *Texas v. Equal Emp. Opportunity Comm'n*, 785 F. Supp. 3d 170, 188 (N.D. Tex. 2025), the court struck down internal EEOC guidance on evaluating claims of harassment established under the Biden Administration.



In doing so, the court addressed a misreading of *Bostock* and rejected the EEOC's efforts to expand the protected classes under Title VII.  There, the court held:

> The Guidance obliquely references *Bostock* in various footnotes and citations to bolster the Enforcement Guidance's transgender dress, pronoun, and bathroom rules. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 650, 140 S.Ct. 1731, 207 L.Ed.2d 218 (2020). And presumably, the Guidance also relies on *Bostock* to aver that Title VII "sex" now includes both gender identity and sexual orientation. But *Bostock* expressly refused to redefine "sex" under Title VII.
>
> In *Bostock*, the parties offered competing definitions of "sex." *Id.* at 655, 140 S.Ct. 1731. But the Supreme Court expressly declined all invitations to newly define Title VII "sex." Instead, the majority affirmed a bedrock principle of Title VII: "Sex" refers "only to biological distinctions between male and female." *Id.* And "homosexuality and transgender status are *distinct concepts* from sex." *Id.* at 669, 140 S.Ct. 1731 (emphasis added). Thus, the *Bostock* court firmly refused to expand the definition of "sex" beyond the biological binary. Consequently, *Bostock* does not authorize the Guidance's expansion of Title VII "sex" to include new categories or classes.

*Id.* at 188.

Further, the law is much clearer when it comes to the scope of Title IX.  The Eleventh Circuit has stated unequivocally that Title IX's prohibition against sex discrimination does not extend to gender identity discrimination. *Adams by and through Kasper v. School Board of St. Johns County*, 57 F.4th 791, 815 (11th Cir. 2022) (en banc) ("we read "sex" in Title IX to mean "biological sex," as we must"). Indeed, U.S. district courts in Florida have consistently applied this interpretation. In *D.N. by Jessica N. v. DeSantis*, 701 F.Supp.3d 1244 (S.D. Fla. 2023), the Southern District of Florida when considering Florida's Fairness in Women's Sports Act reaffirmed that "gender identity" was not a suspect class under Title IX.  *Id.* at 1265 ("this argument—that the Plaintiff [who is a biological male] is a *girl* and that treating her differently than a "cisgender" girl or a transgender boy violates Title IX—is plainly foreclosed by the Eleventh Circuit's holding in *Adams*.").

Additionally, in *Skrmetti*, three justices all held that "transgender status" is not a suspect class under the Equal Protection Clause similar to sex.  145 S. Ct. at 1851 (Barrett, J., concurring joined by Thomas, J.); *id.* at 1855, 1860 (Alito, J. concurring).



**Conclusion**

FAU's suspension of Dr. Cole is not only inconsistent with its own policies and regulations but is in direct violation of long established First Amendment jurisprudence. Dr. Cole's personal social media comments were unrelated to FAU, have done nothing to interfere with the operations of the University, undermine his ability to perform his job duties, or create an unsafe or discriminatory environment for colleagues or students. Rather, he debated individuals in the quintessential public forum of social media on significant issues of the day. Such speech is protected by the U.S. and Florida constitutions.

FAU should reinstate Dr. Cole immediately and compensate him for the harm inflicted on him by its unconstitutional actions. The Provost and other members of the administration who authorized and took this action violated long established law to impose substantial injury to Dr. Cole for which restitution should be made.

Sincerely,

Edward H. Trent
Attorneys for Rebel A. Cole, Ph.D.